PER CURIAM.
This case is an appeal from an order denying after hearing a petition for revocation of probate of the last will of a decedent.
On May 14, 1964, the last will and testament of John Wesley Burkhart, deceased, was admitted to probate by order of the County Judge of Pinellas County, and on the same day letters testamentary issued to Union Trust Company to act as Administrator Cum Testamento Annexo of said estate. Thereafter, on December 28, 1964, petition was filed to revoke the probate of said will by two sisters, a niece, and a nephew of decedent, who were his closest heirs at law at the time of his death, on the ground that decedent did not have testamentary capacity when he made the will. Extensive testimony, depositions, and other proofs were taken before the County Judge. Two sets of witnesses were in irreconcilable conflict, one set testifying to his full mental capacity and the other to his complete lack of testamentary capacity.
*738 The able County Judge, who heard personally those witnesses testifying before him, handed down a final order upholding probate of the will and denying the petition for revocation. The order quite ably set forth the issues involved and discussed the evidence pro and con upon those issues, and contained his conclusions therefrom. From an examination of the entire record, it is our view that his findings are abundantly supported by competent, substantial evidence. The Judge’s final order is so lucid and comprehensive that we adopt his findings and conclusions contained therein as a part of this opinion, as follows:
“[T]he Court finds, as follows:
“1. That the sole ground alleged for revocation was that the testator lacked testamentary capacity on the date of execution of the disputed Will, October 7, 1959.
“2. That the decedent died a resident of St. Petersburg, Florida, on December 9, 1963, at the approximate age of eighty-one. That his second wife had predeceased him, having died in Ohio in August, 1959.
“3. That on February 12, 1960, the decedent, Mr. Burkhart, was adjudged to be incompetent by this Court by reason of cerebral arteriosclerosis with senility, finding his propensities to be suspiciousness, aggressiveness and irritability. Judge Ulmer’s order adjudging further states that Mr. Burkhart personally appeared before the Court. A guardian of the person and a guardian of the property were duly appointed. However, Mr. Burkhart continued to live at home until July, 1962, when he was placed in a rest home.
“4. Mr. Burkhart was born and raised in the area of Morrow County, Ohio. He had many friends and contacts there. During his younger days he apparently was one of its leading citizens. The record discloses that he made virtually annual trips to Morrow County. His wife died there. It is apparent to this Court that his interest and contact with Morrow County, Ohio, was of long standing duration. The bequests to charitable organizations located in Morrow County do not appear to be unnatural under the circumstances.
“5. The disputed Will was drafted in Ohio by an Ohio lawyer with seven years’ legal experience at the time of preparing the Will and although he had known Mr. Burkhart during these seven years, the preparation of the Will was the first legal work performed for him. The scrivener testified that on the two or three conferences, which would have been the original interview when the terms were discussed and possibly a second conference, at which time a deed was brought to the office, and the final conference at which time the Will was executed, the scrivener at all times found him to be completely lucid; that his conversation was direct; that he knew what he was talking about and what he wanted; that he explained why he was allowing Mr. Jaggers the option of purchasing certain property; that the testator likewise specified an additional provision regarding the charitable bequest contained in his prior Will, whereby the bequest was to be used in the county rather than through the state home office. The scrivener further testified that he, the attorney, had recited the Ohio residence for selfish reasons of his own.
“6. That the acquaintances who had known Mr. Burkhart for many years in Morrow County, Ohio, who saw him at the time of his wife’s funeral in August, 1959, and during the approximate time of execution of the Will, found him to be normal both in appearance and mentality and able to converse in a normal way. Mr. Burkhart’s neighbors in St. Peters-burg, where he returned both after his wife’s funeral in Ohio and after his brief return to Ohio at which time the Will was executed, likewise found him to be normal, both in appearance and *739 mentality, until after such time that a housekeeper was employed by the guardian and even later, some saying that he was normal until he went to the rest home, which he entered in July, 1962.
“7. However, the relatives of Mr. Burkhart testified that he began to show signs of senility as early as 1956. They related that he no longer cared for his personal appearance, that he failed to recognize old relations, that he became lost in his own neighborhood and even in the home of his niece where he was visiting, that he became slovenly and merely stared into space for endless hours, and that these things occurred prior to and about the time of the execution of the disputed Will.
“It, therefore, appears to this Court that the question Involved here is not one of lucid intervals at the time of execution but it is more a question of degree of senility from which Mr. Burkhart suffered at that time. Both sides presented expert testimony. The contestants used Dr. Holtzman, a psychiatrist who was unacquainted with the decedent, and therefore, testified solely upon the basis of a hypothetical question presented which fairly set forth much of the testimony of the opponents presented before this Court, and, based upon such hypothetical question, Dr. Holtzman found that Mr. Burkhart ‘was suffering from a mental illness, the nature of which seems to be a chronic brain syndrome associated with senile brain disease, with probably associated ateriosclerosis with a psychotic type of reaction’ and that a sclerotic condition was fairly advanced in October, 1959, and that his deterioration had progressed for ten or eleven years, and that on October 7, 1959, he was unable to comprehend the act of making a valid Will. The doctor further testified that the hypothetical question failed to show any periods of lucidity. I agree with the doctor insofar as his answer is related to the facts presented in the hypothetical question. However, the entire record discloses other facts as to the mentality of Mr. Burkhart, and I conclude that the doctor’s opinion is not determinative of Mr. Burkhart’s competency when the matter is considered in the light of all of the evidence. Mr. Burkhart continued to transact affairs up until the time of adjudication, travel alone, and even live alone for months after his adjudication.
These things and others were not included in the facts presented to Dr. Holtz-man, whereby I do not find it necessary to adopt his conclusions.
“Dr. Rubin was the psychiatrist presented by the proponents. Although he had served on the Court-appointed committee which examined Mr. Burkhart in February, 1960, he had no independent recollection of Mr. Burkhart, whereby his testimony was likewise limited to a hypothetical situation and he testified that, based upon the committee report and what was set forth in it, that as a matter of reasonable medical certainty it would be possible or probable that said individual would have lucid intervals, whereby he would have a general understanding of the nature of his property, the act of executing a Will and the identity and relationships of people around him. He further stated that a person could be quite disturbed, out of contact and disoriented, and the next day be totally clear and lucid.
“Whereupon we return to the sole question to be determined, which is the testamentary capacity of Mr. Burkhart on October 7, 1959. The scrivener found no reason to question Mr. Burkhart’s mentality. A second witness to the Will, Mr. Mosher, testified that Mr. Burkhart was dressed in his ordinary way, which was very neat. The witness did not testify as to Mr. Burkhart’s mentality. The testator had been conversant about his property, as well as the terms of his prior Will. He, likewise, expressed con *740 cern about returning to Florida because of some sort of problem with the family but that even so he had every intention of returning to Florida.
“It appears to this Court that Mr. Burkhart arrived at the terms of his Will through logical thought process, properly motivated and consistent with his prior Will, and although his Will disinherited his relatives, it was a natural one.
“The testimony in this cause is, in many respects, in conflict. This opinion cannot cover all the matters presented to the Court in the cause. However, all of the evidence and testimony has been carefully considered.
“It is my conclusion that although Mr. Burkhart was one of great age with enfeebled mind and failing memory, he did possess testamentary capacity at the time of the execution of the Will in contest.”
Thereupon, revocation of probate of the will was denied, the petition dismissed, and the previous order admitting the will to probate was reaffirmed.
In the last analysis, disposition of the case depended upon a factual determination. It may well be that if we had been sitting as a nisi prius Court hearing the facts, we would have made a different determination. But that was the exclusive province of the County Judge, subject only to an abuse of discretion, a legal insufficiency of the evidence, or a misconception of the probative effect of the evidence. The record does not reveal the existence of any of these latter exceptions.
The order appealed from is therefore affirmed.
Affirmed.
LILES, C. J., and SHANNON and PIERCE, JJ., concur.